E-FILED
Friday, 10 July, 2026  12:44:56 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

|  |  |
|---|---|
| JEANNE IVES,<br><br>    *Plaintiff*,<br><br> v.<br><br>JB PRITZKER, in his official capacity as Governor of Illinois; BERNADETTE MATTHEWS, in her official capacity as Executive Director of the Illinois State Board of Elections; and the ILLINOIS STATE BOARD OF ELECTIONS,<br><br>    *Defendants.* | No. 3:26-cv-3158-SEM-DJQ |

**GOVERNOR PRITZKER'S MEMORANDUM OF LAW IN SUPPORT OF
HIS MOTION TO DISMISS PURSUANT TO RULES 12(B)(1) AND 12(B)(6)**

KWAME RAOUL
Attorney General of Illinois

Alex Hemmer
Michelle Petersen
Holly Berlin
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
alex.hemmer@ilag.gov
(312) 814-3000

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

      A.    Legal Background ........................................................................................ 2

      B.    Procedural History ...................................................................................... 4

LEGAL STANDARD .......................................................................................................... 5

ARGUMENT ....................................................................................................................... 5

I.      The Complaint Fails To Plausibly Allege Article III Standing. ........................... 5

II.     The Complaint Fails To Plausibly Allege That The Act Facially Violates The Fifteenth Amendment. .......................................................................................... 10

      A.    The Act does not facially violate the Fifteenth Amendment by regulating redistricting. ...............................................................................11

      B.    The Act does not facially violate the Fifteenth Amendment in any other respect. ...................................................................................................... 15

III.    The Complaint Fails To Plausibly Allege That The Act Violates Section 2 Of The Voting Rights Act. ........................................................................................... 18

CONCLUSION .................................................................................................................. 21

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ala. Legislative Black Caucus v. Alabama*,
   575 U.S. 254 (2015)................................................................8, 9

*Alexander v. S.C. State Conf. of the NAACP*,
   602 U.S. 1 (2024)................................................................11, 15

*Allen v. Milligan*,
   599 U.S. 1 (2023)................................................................16

*Ames v. Ohio Dep't of Youth Servs.*,
   605 U.S. 303 (2025)................................................................16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................9, 15

*Bartlett v. Strickland*,
   556 U.S. 1 (2009)................................................................2

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................5

*Beer v. United States*,
   425 U.S. 130 (1976)................................................................11

*Bostock v. Clayton Cnty.*,
   590 U.S. 644 (2020)................................................................16

*Bush v. Vera*,
   517 U.S. 952 (1996)................................................................8, 12

*City of Mobile v. Bolden*,
   446 U.S. 55 (1980)................................................................18

*Coal. for TJ v. Fairfax Cnty. Sch. Bd.*,
   68 F.4th 864 (4th Cir. 2023)................................................................17

*Davis v. Guam*,
   932 F.3d 822 (9th Cir. 2019)................................................................15

*Doe v. Reed*,
   561 U.S. 186 (2010)................................................................10

ii

*Easley v. Cromartie*,
    532 U.S. 234 (2001) ................................................................................12

*Gill v. Whitford*,
    585 U.S. 48 (2018) ....................................................................6, 7, 8, 9

*Higginson v. Becerra*,
    786 F. App'x 705 (9th Cir. 2019) ...........................................................17

*Kirksey v. R.J. Reynolds Tobacco Co.*,
    168 F.3d 1039 (7th Cir. 1999). ..................................................................5

*Lance v. Coffman*,
    549 U.S. 437 (2007) (per curiam) .............................................................6

*Larkin v. Finance System of Green Bay, Inc.*,
    982 F.3d 1060 (7th Cir. 2020) ...............................................................6, 7

*Louisiana v. Callais*,
    146 S. Ct. 1131 (2026) ...............................................................14, 18, 19

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ...............................................................................6, 8

*McConchie v. Scholz*,
    567 F. Supp. 3d 861 (N.D. Ill. 2021) .......................................................4

*McConchie v. Scholz*,
    577 F. Supp. 3d 842 (N.D. Ill. 2021) ..................................................4, 17

*Miller v. Johnson*,
    515 U.S. 900 (1995) ................................................................................12

*Neita v. City of Chicago*,
    830 F.3d 494 (7th Cir. 2016) .....................................................................5

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007) ...........................................................................16, 17

*Portugal v. Franklin Cnty.*,
    530 P.3d 994 (Wash. 2023) .................................................................17, 20

*Radogno v. ISBE*,
    No. 11-cv-4884, 2011 WL 5025251 (N.D. Ill. Oct. 21, 2011) ..........10, 13, 14

*Reynolds v. Sims*,
    377 U.S. 533 (1964) ...................................................................................7

*Rice v. Cayetano*,
    528 U.S. 495 (2000)................................................................................15, 20

*Rogers v. Lodge*,
    458 U.S. 613 (1982)........................................................................................20

*Sanchez v. City of Modesto*,
    145 Cal. App. 4th 660 (2006).........................................................................17

*Shaw v. Reno*,
    509 U.S. 630 (1993)........................................................................................11

*Smith v. Boyle*,
    144 F.3d 1060 (7th Cir. 1998).........................................................................18

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016).......................................................................................5, 6

*Sweeney v. Raoul*,
    990 F.3d 555 (7th Cir. 2021)............................................................................6

*Taylor v. McCament*,
    875 F.3d 849 (7th Cir. 2017)............................................................................5

*Terry v. Adams*,
    345 U.S. 461 (1953)........................................................................................15

*United States v. Hays*,
    515 U.S. 737 (1995)..................................................................6, 7, 8, 9, 12

*United States v. Salerno*,
    481 U.S. 739 (1987)..................................................................................10, 13

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)..................................................................................17, 18

*Voinovich v. Quilter*,
    507 U.S. 146 (1993)........................................................................................11

*White v. Regester*,
    412 U.S. 755 (1973)........................................................................................20

**Constitutional Provisions and Statutes**

U.S. Const. amend. XV................................................................................10, 15, 16

Ill. Const. 1970 art. IV .....................................................................................2, 12

52 U.S.C. § 10301..........................................................................................18, 19

Ill. Pub. Act No. 96-1541 (2011) ....................................................................................2

Ill. Pub. Act No. 102-663 (2021) ...................................................................................4

10 ILCS
     92/1 ..........................................................................................................................4
     92/5 ..........................................................................................................................4
     120/5-1 .....................................................................................................................2
     120/5-5 .............................................................................................. *passim*

**Other Authorities**

96th Gen. Assemb., House Proceedings, Jan. 4, 2011,
     https://ilga.gov/Documents/House/transcripts/Htrans96/09600159.pdf.............................3

96th Gen. Assemb., Senate Proceedings, Dec. 1, 2010,
     https://ilga.gov/Documents/Senate/transcripts/Strans96/09600136.pdf......................2, 3, 4

**INTRODUCTION**

Illinois law requires state legislators to redraw the State's legislative map decennially, and in doing so to create districts that are compact, contiguous, and equal in population. In 2011, the Illinois General Assembly passed a statute that supplements those standards by requiring state legislators to consider whether it is possible to preserve communities of minority voters in areas in which it is possible for those voters to exercise electoral power. But the statute's rule is qualified in multiple ways: It applies only *after* legislators have satisfied the State's traditional redistricting principles (requiring legislators to "subordinate" its rule to those principles), and it expressly prohibits legislators from considering race in a manner prohibited by federal law, including the U.S. Constitution.

Plaintiff disagrees with the secondary redistricting principle established by the Act, but her complaint fails on multiple independent grounds and should be dismissed. A plaintiff invoking the federal courts' jurisdiction must allege an injury that is personalized to her, but plaintiff alleges no more than an abstract disagreement with the Act that could be shared by any Illinois voter. In particular, although the Supreme Court has held that a voter in a redistricting case has standing only to challenge the drawing of her *own* legislative district, plaintiff does not even identify the districts in which she resides, nor allege that Illinois legislators impermissibly considered race in drawing those districts. And if the Court were to reach the merits, it should dismiss the complaint for failure to state a claim. The Supreme Court has held that States may consider race in districting as long as race does not "predominate" over traditional districting principles, and the statute challenged here follows that rule, instructing legislators that race is "subordinate" to those principles and that, regardless, they cannot consider race in a manner prohibited by federal law. Plaintiff's constitutional and statutory claims thus fail for that reason and others, and should be dismissed.

**BACKGROUND**

A.    **Legal Background**

The Illinois Constitution mandates that the General Assembly reconfigure the boundaries of the Illinois legislative (Senate) and representative (House) districts every ten years, accounting for population changes reflected in the decennial census. Ill. Const. 1970 art. IV, § 3(b). There are 59 legislative districts and 118 representative districts, and the state constitution requires that each district be "compact, contiguous, and substantially equal in population." *Id.* §§ 1, 3(a).

In 2011, the Illinois General Assembly passed the Illinois Voting Rights Act ("the Act"), which supplements the constitutional standards for drawing state legislative districts. Ill. Pub. Act No. 96-1541, § 5 (2011) (codified at 10 ILCS 120/5-1 *et seq.*). Specifically, the Act provides that, where possible—and *after* satisfying the requirements set out in the Constitution and applicable federal law—legislators should try to preserve communities of minority voters in areas in which those communities are of a size and cohesion that they could exert electoral power. It does so by instructing legislators that a state legislative map "shall be drawn, subject to subsection (d) of this Section, to create crossover districts, coalition districts, or influence districts." 10 ILCS 120/5-5(a). The terms "crossover district," "coalition district," and "influence district," and their definitions, are taken from the Supreme Court's opinion in *Bartlett v. Strickland*, 556 U.S. 1, 13-14 (2009). *See* 96th Gen. Assemb., Senate Proceedings, Dec. 1, 2010, at 26-27 ("Senate Tr.") (statement of Sen. Raoul) ("all of these terms . . . are taken directly from the United States Supreme Court in the *Bartlett* decision").[1] The Act applies only to the decennial redistricting of state legislative districts. *See* 10 ILCS 120/5-5(a).

---

[1] https://ilga.gov/Documents/Senate/transcripts/Strans96/09600136.pdf.    The Act defines a crossover district as one "where a racial minority or language minority constitutes less than a majority of the voting-age population but where this minority, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and

The Act's text makes clear that the standards it sets out play a supplemental role in the decennial redistricting process. The Act states that its standards are "in addition and subordinate to any requirements or obligations imposed by the United States Constitution, any federal law regarding redistricting Legislative Districts or Representative Districts, including but not limited to the federal Voting Rights Act, and the Illinois Constitution." *Id.* Its final subsection reiterates that "[n]othing in this Act shall be construed, applied, or implemented in a way that imposes any requirement or obligation that conflicts with the United States Constitution, any federal law regarding redistricting Legislative Districts or Representative Districts, including but not limited to the federal Voting Rights Act, or the Illinois Constitution." *Id.* § 120/5-5(d).

The Act's sponsors and legislative leaders described the purposes of the law in similar terms. In the House, Majority Leader Barbara Flynn Currie explained that the Act simply required legislators to "make sure that after the other requirements have been met in remapping and redistricting," including "that districts are of equal size, contiguous[,] and compact," then mapmakers should "draw, if it's possible, minority influence, crossover, and . . . coalition districts." 96th Gen. Assemb., House Proceedings, Jan. 4, 2011, at 44-45 (statement of Rep. Currie).[2] Likewise, then-State Senator Raoul, who sponsored the legislation in the Senate, explained that the Act's instruction to preserve minority voting was triggered "only after the mapmaker has complied with these other redistricting mandates." Senate Tr. 40. In response to a question about

---

who cross over to support the minority's preferred candidate"; a coalition district as one "where more than one group of racial minorities or language minorities may form a coalition to elect the candidate of the coalition's choice"; and an influence district as one "where a racial minority or language minority can influence the outcome of an election even if its preferred candidate cannot be elected." 10 ILCS 120/5-5(b).

[2] https://ilga.gov/Documents/House/transcripts/Htrans96/09600159.pdf.

3

the Act's constitutionality, Senator Raoul explained that the Act was constitutional because its direction was "subordinate to any requirement imposed by the United States Constitution." *Id.*

In 2021, the Illinois General Assembly redrew the State's legislative maps, consistent with article IV of the state constitution. *See* Ill. Pub. Act No. 102-663 (2021) (codified at 10 ILCS 92/1 *et seq.*).[3] The public act that establishes the maps expressly incorporates separate House and Senate resolutions explaining how the maps were drawn. *See* 10 ILCS 92/5. The 2021 maps were upheld as compliant with the section 2 of the Voting Rights Act of 1965 and the Equal Protection Clause of the U.S. Constitution. *See McConchie v. Scholz*, 577 F. Supp. 3d 842 (N.D. Ill. 2021) (three-judge district court).

## B.    Procedural History

Plaintiff is "an Illinois resident and voter" who disagrees with the secondary redistricting principle established by the Act. Doc. 1 ("Compl.") ¶ 7. Plaintiff does not allege that she lives in a "crossover," "coalition," or "influence" district, or that she lives in a district specifically impacted by the Act. Instead, she alleges that she is "a registered voter who has voted in past elections and intends to vote" in the future; that "Illinois' legislative districts and representative districts were drawn pursuant to" the Act as a general matter; and that, as a result, "she has been placed in racially engineered districts." *Id.* ¶ 15.

On May 5, plaintiff filed this complaint against JB Pritzker, in his official capacity as Governor of Illinois; Bernadette Matthews, in her official capacity as the Executive Director of the

---

[3] Because of the global COVID-19 pandemic, the United States Census Bureau did not release census population data in time for the General Assembly to meet the deadline set out in the state constitution, and so the General Assembly instead enacted a timely redistricting plan using data from the American Community Survey. *See McConchie v. Scholz*, 567 F. Supp. 3d 861, 870-71 (N.D. Ill. 2021). The General Assembly ultimately redrew the maps after the census data was issued, and those maps are currently in effect.

Illinois State Board of Elections; and the Illinois State Board of Elections.  Count One alleges that the Act violates the Fifteenth Amendment by requiring Illinois legislators to use race to draw district lines.  *Id.* ¶¶ 34-39.  Count Two alleges that the Act violates section 2 of the Voting Rights Act for the same reasons.  *Id.* ¶¶ 40-43.  Plaintiff seeks a declaration that the Act violates the Fifteenth Amendment and section 2(a) of the Voting Rights Act, to enjoin defendants from acting pursuant to the Act, and payment of related litigation costs.  *Id.* ¶¶ 44-48.

## LEGAL STANDARD

Standing is a threshold requirement with the "plaintiff, as the party invoking federal jurisdiction, bear[ing] the burden of establishing" standing.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  If a plaintiff lacks standing, the court "lacks subject matter jurisdiction and the suit must be dismissed under Rule 12(b)(1)."  *Taylor v. McCament*, 875 F.3d 849, 853 (7th Cir. 2017).

A defendant is entitled to dismissal under Rule 12(b)(6) where a complaint's allegations, even if true, fail to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The claim for relief also must be "legally sound."  *Neita v. City of Chicago*, 830 F.3d 494, 497 (7th Cir. 2016).  A complaint devoid of "legal merit" is "vulnerable to dismissal under Rule 12(b)(6)."  *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999).

## ARGUMENT

I.    **The Complaint Fails To Plausibly Allege Article III Standing.**

To start, plaintiff has failed to allege Article III standing.  A plaintiff invoking the federal courts' jurisdiction must allege an injury that is personalized to *her*, but plaintiff alleges no more than a disagreement with the Act that could be raised by any Illinois voter.  And although the Supreme Court has held that a voter in a redistricting case can challenge only the drawing of her *own* legislative district, plaintiff does not identify the districts in which she resides, nor allege that

5

Illinois legislators impermissibly considered race in drawing those districts.  The complaint should be dismissed on that basis.

"To ensure that the Federal Judiciary respects the proper—and properly limited—role of the courts in a democratic society, a plaintiff may not invoke federal-court jurisdiction unless she can show a personal stake in the outcome of the controversy."  *Gill v. Whitford*, 585 U.S. 48, 65 (2018) (cleaned up).  A plaintiff must thus allege that she has suffered an injury in fact that is traceable to the defendants and is capable of being redressed through a favorable judicial ruling.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021).  The plaintiff's alleged injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," to give rise to standing.  *Lujan*, 504 U.S. at 560 (quotation marks omitted).  A "particularized" injury is one that "affect[s] the plaintiff in a personal and individual way," *id.* at 560 n.1, whereas a concrete injury is one that is "real," not "abstract," *Spokeo*, 578 U.S. at 340.  She must allege a "causal connection between the injury and the conduct complained of" and a likelihood that the injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 561.  At the pleading stage, the court considers the sufficiency of the complaint, which must "clearly allege facts demonstrating each element" of standing.  *Larkin v. Finance System of Green Bay, Inc.*, 982 F.3d 1060, 1064 (7th Cir. 2020) (cleaned up).

These requirements are particularly important in cases brought by individual voters to challenge state statutes.  The Supreme Court has "repeatedly refused to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power," *United States v. Hays*, 515 U.S. 737, 743 (1995), and it has applied that rule to turn down lawsuits brought by voters alleging only "that the law . . . has not been followed," *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam).  As the Court has explained, a "person's

right to vote is 'individual and personal in nature,'" and so "voters who allege facts showing disadvantage to themselves *as individuals* have standing to sue" to remedy that harm. *Gill*, 585 U.S. at 65-66 (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964); emphasis added); *accord Larkin*, 982 F.3d at 1064 ("the plaintiff [her]*self* must have *personally* suffered an actual injury or imminent threat of injury" (emphasis in original)). So although a plaintiff might have standing where a statute has placed "a burden on th[at] plaintiff['s] own vote[]," she cannot invoke a theory of "statewide harm" based on a law's effect on "the overall composition of the legislature." *Gill*, 585 U.S. at 68.

The Supreme Court has applied this principle repeatedly in the legislative districting context. The plaintiffs in *United States v. Hays*, 515 U.S. 737, brought suit to challenge the State of Louisiana's congressional districting plan, alleging that both the plan as a whole and one specific district within it had been racially gerrymandered, *id.* at 738-39. But because the plaintiffs did not personally live within that specific district, the Supreme Court held that they had not shown "that they, personally, ha[d] been subjected to a racial classification," and accordingly lacked standing. *Id.* at 739. "Where a plaintiff resides in a racially gerrymandered district," the Court explained, she "may suffer the special representational harms racial classifications can cause in the voting context," and so "has standing to challenge the [State's] action." *Id.* at 744-75. But "where a plaintiff does not live in such a district, he or she does not suffer those special harms," and so she generally will lack standing to sue. *Id.* at 754. It did not matter, the Court explained, that plaintiffs were attempting to "challenge[]" the enactment establishing the State's districts "in its entirety": "The fact that [the law] *affects* all Louisiana voters by classifying each of them as a member of a particular congressional district does not mean—even if [it] inflicts race-based injury on *some* Louisiana voters—that *every* Louisiana voter has standing to challenge [it] as a racial

7

classification." *Id.* at 746. At bottom, the Court held, "[t]he rule against generalized grievances applies with as much force" in the racial-gerrymandering context "as in any other." *Id.* at 743-44. The Supreme Court has repeatedly reaffirmed and applied this rule to limit standing in cases involving allegations of racial gerrymandering to plaintiffs who actually reside in districts that are said to have been gerrymandered. *See Gill*, 585 U.S. at 66-67; *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 263 (2015); *Bush v. Vera*, 517 U.S. 952, 957-58 (1996).

Plaintiff's complaint transparently fails to plead an individualized injury. Plaintiff does not allege "facts showing disadvantage to [her] as [an] individual" voter, *Gill*, 585 U.S. at 65-66, nor does she allege any "individual and personal," *id.*, way in which she was discriminated against or disadvantaged on account of her race. As the "party invoking federal jurisdiction," plaintiff "bears the burden of establishing" standing, including by alleging a concrete, particularized injury. *Lujan*, 504 U.S. at 561. But plaintiff instead relies on alleged injuries that could be shared by any Illinois voter, and thus are paradigmatic generalized grievances. Plaintiff, for instance, appears to suggest that she is injured because "[a] citizen of a state that unconstitutionally makes race a purpose of legislative line drawing is harmed," Compl. ¶ 15, and because "Illinois' legislative districts and representative districts were drawn with racial intent," *id.* ¶ 16. But allegations of that sort have nothing to do with plaintiff herself; they amount to a claim that, because the State has (in plaintiff's view) generally taken race into account in an impermissible way in drawing its legislative districts, she has standing to challenge the Act. But, again, "[t]he rule against generalized grievances applies with as much force in the equal protection context as in any other," *Hays*, 515 U.S. at 743, and that is the only injury plaintiff has alleged here.

Indeed, plaintiff's complaint specifically founders on the rule set out in *Hays*. Under *Hays*, "a plaintiff who alleges that [s]he is the object of a racial gerrymander . . . has standing to assert

8

only that h[er] own district has been so gerrymandered." *Gill*, 585 U.S. at 66; *see Hays*, 515 U.S. at 744-45. "Plaintiffs who complain of racial gerrymandering in their State cannot sue to invalidate the whole State's legislative districting map; such complaints must proceed 'district by district.'" *Gill*, 585 U.S. at 66-67 (quoting *Ala. Legislative Black Caucus*, 575 U.S. at 262). But plaintiff does not assert that Illinois has "drawn" her *specific* legislative or representative district "with racial intent," Compl. ¶ 16; indeed, plaintiff does not even allege the voting districts in which she resides. And although plaintiff asserts that she "has been placed in racially engineered districts," *id.*, that allegation is based on a faulty syllogism: Plaintiff is an Illinois voter, Illinois drew its legislative districts "pursuant to the Illinois Voting Rights Act," and, "[a]ccordingly," plaintiff must live in a "racially engineered" district. *Id.* But the Act does not command Illinois mapmakers to prioritize race over other factors; indeed, it tells them to "subordinate" race to those factors. *Supra* p. 3. Plaintiff is thus incorrect that the Act's mere existence means that she lives in a "racially engineered" district, Compl. ¶ 16, and the Court should disregard that allegation. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). At bottom, plaintiff is just like the plaintiffs in *Gill* and *Hays*, who likewise attempted to circumvent the rule that they plead an individualized injury. The Supreme Court rejected those arguments, *see Gill*, 585 U.S. at 68 (rejecting argument "that [plaintiffs'] legal injury is not limited to the injury that they have suffered as individual voters, but extends also to" form of "statewide harm"); *Hays*, 515 U.S. at 746 (similar), and this Court should do the same.

At bottom, plaintiff has alleged no more than an abstract disagreement with the Act of the kind insufficient to confer standing. Her complaint should be dismissed under Rule 12(b)(1).

9

**II.    The Complaint Fails To Plausibly Allege That The Act Facially Violates The Fifteenth Amendment.**

If the Court reaches the merits, Count One should be dismissed under Rule 12(b)(6) because it fails to plausibly allege that the Act facially violates the Fifteenth Amendment.

The Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged . . . by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. Plaintiff alleges that the Act violates the amendment by "requir[ing] map drawers in Illinois to intentionally use race to draw district lines." Compl. ¶ 37. Plaintiff does not identify any specific district that she believes has been tainted by the use of race, or any other way in which the Act violates the Constitution as applied specifically to her. Rather, she seeks to invalidate the Act "in all its applications," *Doe v. Reed*, 561 U.S. 186, 194 (2010), and so must satisfy the standard for facial constitutional challenges, showing that there is "no set of circumstances . . . under which" it could lawfully be applied, *United States v. Salerno*, 481 U.S. 739, 745 (1987).

The complaint fails to meet that bar. The Act does not require Illinois legislators to prioritize race in drawing legislative districts, in contravention of the Constitution; instead, it tells legislators to "subordinate" race to traditional redistricting principles, 10 ILCS 120/5-5(a), and categorically prohibits legislators from considering race where doing so would violate federal law, including the U.S. Constitution. The Act does not violate the Constitution in so doing; indeed, it is consciously and expressly drawn to ensure that Illinois legislators act at all times consistent with constitutional principles in drawing state maps. Indeed, a three-judge court considered a claim essentially identical to plaintiff's 15 years ago, shortly after the Act's enactment, and rejected it, explaining that the plaintiffs there had failed to allege that the Act was "unconstitutional on its face." *Radogno v. ISBE*, No. 11-cv-4884, 2011 WL 5025251, at *8 (N.D. Ill. Oct. 21, 2011).

10

Plaintiff's complaint identifies no reason to depart from that conclusion. If the Court reaches the merits, it should dismiss Count One with prejudice.

> **A.    The Act does not facially violate the Fifteenth Amendment by regulating redistricting.**

The complaint fails to plausibly allege that the Act facially violates the Fifteenth Amendment in directing Illinois legislators to preserve, where possible, clusters of minority voters in drawing legislative districts.

To start, the Supreme Court has never "held any legislative apportionment inconsistent with the Fifteenth Amendment." *Voinovich v. Quilter*, 507 U.S. 146, 159 (1993); *accord, e.g.*, *Beer v. United States*, 425 U.S. 130, 142 n.14 (1976); *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 55 (2024) (Thomas, J., concurring) ("[T]he Fifteenth Amendment addresses only matters relating to access to the ballot." (cleaned up)). It is the Fourteenth Amendment's Equal Protection Clause that the Supreme Court has interpreted to protect individuals against racial discrimination in districting. *See Shaw v. Reno*, 509 U.S. 630, 642 (1993). So although plaintiff alleges that "[t]he Fifteenth Amendment prohibits drawing maps with any racial intent, goal or purpose," Compl. ¶ 36, she cites no case for that proposition, and every racial-gerrymandering case cited in the complaint arises under the Fourteenth Amendment.

Regardless, even presuming the Fifteenth Amendment limits the consideration of race in redistricting under the same standards that govern Fourteenth Amendment racial-gerrymandering claims—those set out in *Shaw v. Reno* and the cases that follow it—the Act does not facially violate those standards. As the Supreme Court explained in *Shaw*, "redistricting differs from other kinds of state decisionmaking in that the legislature always is *aware* of race when it draws district lines." 509 U.S. at 646 (emphasis in original). As a result, a plaintiff alleging unconstitutional racial gerrymandering must show that "race was the *predominant* factor motivating the legislature's

11

decision" to draw a legislative district a certain way. *Miller v. Johnson*, 515 U.S. 900, 916 (1995) (emphasis added). The plaintiff must, in other words, show "that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions" to "racial considerations." *Id.*; *accord Easley v. Cromartie*, 532 U.S. 234, 241 (2001) ("Race must not simply have been *a* motivation for the drawing of a majority-minority district,' but 'the *predominant* factor motivating the legislature's districting decision.'" (quoting *Bush*, 517 U.S. at 959; second emphasis in *Easley*)).

The Act does not facially violate these standards; indeed, the Act bends over backwards to accommodate them. The Act establishes a secondary redistricting principle in drawing state maps: It directs Illinois legislators to preserve, if possible, communities of minority voters in a given area if those communities are of a size and cohesion that they could exert electoral power. *Supra* p. 2. But the Act expressly makes this instruction "subordinate" to both other districting principles and the limitations of federal and state law. 10 ILCS 120/5-5(a). That is, the Act expressly commands legislators to consider whether certain minority communities can be kept together (a) only *after* considering the other principles set out in the Illinois Constitution for redistricting (i.e., that districts must be "compact, contiguous, and substantially equal in population," Ill. Const. 1970 art. IV, § 3(a)), and (b) only *if* doing so does not violate "the United States Constitution" or any other federal or state law, 10 ILCS 120/5-5(a). Indeed, the Act states this rule *twice*: once in subsection (a) and again, for good measure, in subsection (d). Put differently, not only does the Act not *require* Illinois legislators to treat "race [as] the *predominant* factor" in redistricting, "subordinat[ing] traditional race-neutral districting principles" like "compactness" and "contiguity" to race, *Miller*, 515 U.S. at 916 (emphasis added); it expressly *forbids* them from doing so, instructing them to "subordinate" the consideration of race to such principles, 10 ILCS 120/5-5(a). Legislators thus

12

*cannot* preserve a cluster of minority voters within a district if doing so would "conflict[]" with other districting rules, including those imposed by the U.S. Constitution. *Id.* § 120/5-5(d). Given that, plaintiff cannot plausibly allege that the Act violates the Constitution. At minimum, she cannot plausibly allege that "no set of circumstances exists under which the Act would be valid," *Salerno*, 481 U.S. at 746, as she must to prevail in her facial challenge to the Act.

Indeed, a three-judge district court reached exactly that conclusion in 2011, just after the Act was enacted. The plaintiffs in *Radogno v. ISBE*, 2011 WL 5025251, challenged the Act alongside the legislative map adopted by the General Assembly in the wake of the 2010 Census. They, too, argued that the Act was unconstitutional because it employed "racial classifications," which they contended were "expressly prohibited under the Equal Protection Clause." *Id.* at *8. But the three-judge court rejected that argument and dismissed the relevant claim, explaining that the Supreme Court's precedent permits a State to "take race into consideration" in districting as long as it does not "elevate race to be the *predominant* factor." *Id.* The Act, the court explained, "expends a large percentage of its words ensuring that it complies with this rule," *id.*, chiefly by making its rule "subordinate to" the limitations imposed by the Constitution and federal law, 10 ILCS 120/5-5(a). The court thus held that the Act is "not unconstitutional on its face." 2011 WL 5025251, at *8.

Likewise, subsequent litigation over the *current* state legislative maps, which plaintiff appears to suggest are racially gerrymandered, Compl. ¶¶ 24-26, also shows that the Act is, at minimum, not facially unconstitutional. The plaintiffs in *McConchie v. Scholz*, 577 F. Supp. 3d 842, challenged the current legislative maps shortly after their enactment, alleging among other things that three specific legislative districts were unconstitutional racial gerrymanders, *id.* at 872-85. The court disagreed, explaining that the evidence showed that the legislature had prioritized

13

"political and traditional redistricting criteria," *id.* at 880, over race, and that the evidence showed at most that "race was *a*, not *the*, decisive factor," *id.* at 882. At bottom, the court explained, "the voluminous evidence . . . overwhelmingly establishes that the Illinois mapmakers were motivated principally by partisan political considerations," not by race. *Id.* at 885. *McConchie* alone defeats plaintiff's claim that the Act requires state legislators to prioritize race over traditional redistricting criteria, much less that it requires legislators to do so universally. *See Radogno*, 2011 WL 5025251, at *8. And plaintiff does not seriously contend that *McConchie* was incorrect or, indeed, that any specific legislative district is racially gerrymandered. *Supra* p. 8.

The complaint identifies no reason to reach a different conclusion. Plaintiff repeatedly invokes the Supreme Court's opinion in *Louisiana v. Callais*, 146 S. Ct. 1131 (2026), but *Callais* does not change the constitutional standards for racial-gerrymandering claims. Indeed, *Callais* expressly acknowledges and reiterates the settled "rule that in racial gerrymandering cases, . . . strict scrutiny is triggered only if race 'predominated' in the State's decisionmaking process." *Id.* at 1143; *see also id.* at 1147 ("[I]n gerrymandering cases a challenger must show that race was the government's predominant consideration."). And although *Callais* held that Louisiana had transgressed that constitutional line, it did so because the State had "express[ly] acknowledge[ed]" that its "underlying goal was racial," namely to create a majority-minority district even where doing so would require subordinating other districting goals to race. *Id.* at 1161. Again, the Act here *requires* Illinois legislators to do the opposite: preserve minority voting strength only after satisfying all other traditional redistricting criteria. And *Callais*'s remaining discussion—about the interpretation of section 2 of the federal Voting Rights Act, *id.* at 1153-61—is irrelevant here, because the 2021 maps were not drawn for purposes of complying with that Act, no matter how it is interpreted. *Callais* simply has no bearing here.

14

At bottom, plaintiff's Fifteenth Amendment claim rests on mischaracterizing the Act. The Act does not, as plaintiff asserts, "mandate[] the creation of racial districts," Compl. ¶ 3, or "make racial considerations a core purpose of all legislative line drawing," *id.* at ¶ 22; *see also id.* at ¶¶ 25, 33, 37 (similar); it permits legislators to consider race for a limited purpose (i.e., preserving certain clusters of minority voters in the districting context) and subject to clear and specific limitations, under which race is always "subordinate[d]," 10 ILCS 120/5-5(a), to traditional districting principles and never used in a manner inconsistent with the Constitution. Plaintiff cannot plausibly allege that the Act is constitutionally deficient by asserting that it is something that it is not. *See Iqbal*, 556 U.S. at 678.

**B.     The Act does not facially violate the Fifteenth Amendment in any other respect.**

To the extent plaintiff's claim is that the Act facially violates the Fifteenth Amendment in some other way or under some other legal standard, the complaint also fails to plausibly allege any such deficiency.

Most basically, plaintiff fails to allege that the Act "denie[s] or abridge[s]" her "right . . . to vote," U.S. Const. amend. XV, § 1, in any way *other than* the drawing of legislative districts. The Fifteenth Amendment cases cited in the complaint illustrate the point, in that they primarily concern racially discriminatory restrictions on voter eligibility, not redistricting. *Cf. Alexander*, 602 U.S. at 55 (Thomas, J., concurring) ("the Fifteenth Amendment addresses only matters relating to access to the ballot" (cleaned up)). *Terry v. Adams*, 345 U.S. 461 (1953), for instance, held that political parties cannot prohibit African-Americans from voting in primary elections, *id.* at 468-69 (plurality opinion), and *Rice v. Cayetano*, 528 U.S. 495 (2000), held unconstitutional a state law imposing "an explicit, race-based voting qualification" under which only the descendants of Native Hawaiians could vote for certain state offices, *id.* at 498-99. *Accord Davis v. Guam*, 932 F.3d 822,

15

824 (9th Cir. 2019) (same for Guam law limiting vote to "native inhabitants of Guam").  Plaintiff fails to allege that the Act "abridge[s]" the "right to vote," U.S. Const. amend. XV, § 1, in the way that these statutes do, nor could she.  Rather, plaintiff's claim is simply that the Act causes Illinois to rely impermissibly on race in crafting legislative districts—which means that the standards that the Supreme Court has articulated for such claims apply.  As discussed, *supra* pp. 11-15, the Act facially complies with those standards.

The complaint can be read to suggest that the Act is invalid simply because it requires state legislators to *consider* race under some circumstances, *see* Compl. ¶¶ 19, 21, 22, but if that is plaintiff's theory, it is deeply flawed.  First, as explained, the Act must be assessed under the Supreme Court's established precedents for evaluating the use of race in redistricting, and under those standards, the Act is constitutional.  *Supra* pp. 11-15; *see, e.g.*, *Allen v. Milligan*, 599 U.S. 1, 30 (2023) (explaining that "race consciousness does not lead inevitably to impermissible race discrimination").  Put another way, the Act does not "distribute[] burdens or benefits on the basis of individual racial classifications," *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007); rather, it permits state legislators to consider race for a limited purpose (i.e., preserving certain clusters of minority voters in redistricting) and subject to specific guardrails. Indeed, the Act is facially race-neutral, in that it requires Illinois legislators to keep together clusters of voters that belong to *any* race that might constitute a "minority" in the relevant locality, even where voters of that race might constitute a "majority" statewide.  *See* 10 ILCS 120/5-5(c). Just as Title VII's antidiscrimination rule applies equally to plaintiffs of any color or sex, *see Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 310 (2025); *Bostock v. Clayton Cnty.*, 590 U.S. 644, 659 (2020), the Act directs Illinois legislators to treat individuals of all races equally, without singling out individuals of a particular race for differential treatment or special benefits.  It no more

16

establishes a "racial classification[]" in doing so, *Parents Involved*, 551 U.S. at 720, than does Title VII or any other antidiscrimination law.

For that reason, courts have uniformly held that other state voting rights acts do not classify voters on the basis of race, do not trigger strict scrutiny, and are constitutional. *See Portugal v. Franklin Cnty.*, 530 P.3d 994 (Wash. 2023), *cert. denied*, 144 S. Ct. 1343 (2024); *Higginson v. Becerra*, 786 F. App'x 705 (9th Cir. 2019), *cert. denied*, 590 U.S. 960 (2020); *Sanchez v. City of Modesto*, 145 Cal. App. 4th 660 (2006), *cert. denied*, 552 U.S. 974 (2007). Although these statutes operate in a different manner than the Act does, like the Act, they apply evenhandedly to protect voters of every race from vote dilution, thus protecting all citizens regardless of race or ethnicity. As the Washington Supreme Court explained, upholding that State's voting rights act against a facial challenge, the Washington statute "does not classify voters on the basis of race"; rather, it guarantees "equal voting opportunities for members of every race, color, and language minority group." *Portugal*, 530 P.3d at 1011 (emphasis omitted). Likewise, the California Court of Appeal has held that California's voting rights act allows "members of any racial group . . . to seek redress for a race-based harm, vote dilution," which "does not constitute the imposition of a burden or conferral of a benefit on the basis of a racial classification." *Sanchez*, 145 Cal. App. at 681; *accord Higginson*, 786 F. App'x at 706-07. The same is true of the statute challenged here.

Finally, to the extent the plaintiff's theory is that the Act is "facially neutral," but that it was enacted "with a racially discriminatory purpose," Compl. ¶ 31; *see Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977), she fails to plausibly allege such a claim. A plaintiff contending that a facially neutral enactment violates equal-protection principles must allege "(1) that the policy exacts a disproportionate impact on a certain racial group, and (2) that such impact is traceable to an 'invidious' discriminatory intent." *Coal. for TJ v. Fairfax Cnty. Sch.*

17

*Bd.*, 68 F.4th 864, 879 (4th Cir. 2023) (quoting *Arlington Heights*, 429 U.S. at 265); *see Smith v. Boyle*, 144 F.3d 1060, 1064 (7th Cir. 1998) (describing "[d]isparities" in treatment "so patently without justification as to give rise to an irresistible inference that they are the consequence of intentional discrimination"). Plaintiff has alleged neither. The complaint is devoid of allegations that the Act has had a disparate impact on a particular racial group. And plaintiff does not seriously allege that Illinois acted with "invidious purpose," *City of Mobile v. Bolden*, 446 U.S. 55, 63 (1980) (plurality opinion), in passing or implementing the Act. Although she cites a press release that the Governor issued in 2021, in signing the bill establishing the current legislative map, Compl. ¶¶ 26-27, nothing about the press release reflects an intent to discriminate against anyone; indeed, it simply states that the 2021 maps "meet the requirements" of the Act, thus "adequately preserv[ing] minority representation," *id.* at ¶ 27. There is nothing "invidious," *Arlington Heights*, 429 U.S. at 265, about that.

**III.    The Complaint Fails To Plausibly Allege That The Act Violates Section 2 Of The Voting Rights Act.**

Count Two should also be dismissed under Rule 12(b)(6) because it fails to plausibly allege that the Act violates section 2 of the Voting Rights Act.

Section 2 of the Act prohibits practices—including drawing districts—that render "the political processes leading to nomination or election" "not equally open to participation by" members of a particular racial group, in that members of that group have "less opportunity than other members of the electorate to elect representatives of their choice." 52 U.S.C. § 10301(b); *see Callais*, 146 S. Ct. at 1154. Plaintiffs alleging a section 2 violation thus must provide a "comparator to be used in determining whether" members of a racial group have "less opportunity" than other voters to elect their candidates of choice. *Callais*, 146 S. Ct. at 1154. At the outset, plaintiff fails to specify which—if any—racial group she alleges has less opportunity than others

18

under the State's current map, as well as which—if any—racial group she alleges is disadvantaged by the Act. This pleading deficiency reveals a basic flaw in her theory of the case: She ultimately cannot prevail on her Section 2 claim, because the Illinois Voting Rights Act, like the federal Voting Rights Act, protects electoral power of *all* racial groups. *See* 10 ILCS 120/5-5(c) ("the phrase 'racial minorities or language minorities' . . . means the same class of voters who are members of a race, color, or language minority group receiving protection under the federal Voting Rights Act."); 52 U.S.C. § 10301(a) (prohibiting practices that result in "denial or abridgment of the right of *any* citizen of the United States to vote on account or race or color" (emphasis added)); *see supra* p. 17 (explaining this point). That deficiency independently requires dismissal.

Plaintiff's section 2 claim also fails for other reasons. For one, plaintiff's concern with the Act is primarily that it causes Illinois legislators to draw "legislative districts and representative districts . . . with racial intent." Compl. ¶ 16. But although plaintiff's complaint repeatedly invokes the Supreme Court's opinion in *Callais*, it fails to engage with the standard that *Callais* set forth for section 2 challenges to state districting plans. There are three conditions that plaintiffs must satisfy to make out a Section 2 claim after *Callais*. First, plaintiffs must show "that a community of minority voters" is "sufficiently numerous and compact to constitute a majority in a reasonably configured district." *Callais*, 146 S. Ct. at 1159. The illustrative maps plaintiffs use to satisfy this condition "cannot use race as a districting criterion," and "must meet all the State's legitimate districting objectives." *Id.* Second, plaintiffs "must show politically cohesive voting by the minority." *Id.* And third, plaintiffs must show racial bloc voting by the majority. *Id.* In fulfilling the second and third conditions, the evidence must show that voters' "racial bloc voting . . . cannot be explained by partisan affiliation." *Id.* Allegations satisfying these conditions are absent from plaintiff's complaint, so the section 2 claim fails to the extent it challenges the Act's application to

19

the State's redistricting processes and the maps the State produced in reliance on them—which is all the complaint challenges. *See* Compl. ¶ 15 (alleging that plaintiff is injured because she was "placed in racially engineered districts").

The section 2 claim also fails because plaintiff fails to plead discriminatory intent. The complaint appears to suggest that mere awareness of race in the redistricting context is enough to violate the federal Voting Rights Act. *E.g.*, Compl. ¶ 19 (Act "requires explicit consideration of race"), *id.* ¶ 21 (same). This is plainly incorrect. Section 2 provides a remedy for practices and procedures with an "invidious purpose": those that intentionally discriminate against a particular racial group. *See*, *e.g.*, *Rogers v. Lodge*, 458 U.S. 613, 622 (1982) (affirming the district court's finding that an at-large voting system "was being maintained for the invidious purpose of diluting the voting strength of the black population"); *White v. Regester*, 412 U.S. 755 (1973) (referencing prior "claims that multimember districts are being used invidiously to cancel out or minimize the voting strength of racial groups"). But, as discussed, *supra* pp. 17-18, the Act neither establishes a racial classification nor was motivated by discriminatory intent. Indeed, the Act seeks only to ensure that *no* racial group is unfairly deprived of an opportunity to elect their candidates of choice, consistent with the Constitution. *See* 10 ILCS 120/5-5; *cf. Portugal*, 530 P.3d at 1011 (similar Washington statute "does not classify voters on the basis of race" but instead guarantees "equal voting opportunities for members of every race, color, and language minority group").

At bottom, plaintiff appears to view Count Two as coterminous with Count One, asserting that section 2 is "synonymous" with the Fifteenth Amendment. Compl. ¶ 41. (Indeed, plaintiff cites only one case to support her section 2 claim, *Rice v. Cayetano*, 528 U.S. 495; Compl. ¶ 42, but *Rice* is a Fifteenth Amendment case that does not cite the Voting Rights Act at all.) But even if section 2 and the Fifteenth Amendment were "synonymous," that means only that plaintiff's

section 2 claim fails for the reasons her Fifteenth Amendment claim does, *supra* pp. 10-18, and she has identified no additional bases on which her section 2 claim survives if that claim does not. The complaint thus fails to state a claim and should be dismissed under Rule 12(b)(6).

## CONCLUSION

The complaint should be dismissed without prejudice for failure to plead Article III standing or, alternatively, dismissed with prejudice for failure to state a claim.

Dated: July 10, 2026

Respectfully submitted,

KWAME RAOUL
Attorney General of Illinois

/s/ Alex Hemmer
Alex Hemmer
Michelle Petersen
Holly Berlin
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
alex.hemmer@ilag.gov
(312) 814-3000

*Counsel for Defendants*

21

## CERTIFICATE OF COMPLIANCE

I certify pursuant to Civil Local Rule 7.1(B)(4)(c) that this memorandum complies with the type-volume limitation.    This memorandum contains 6,810 words, including headings, footnotes, and quotations, and excluding the cover page, tables, and signature block.


/s/ Alex Hemmer
Alex Hemmer